## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mario O.,                                          Case No. 21-CV-2469 (NEB/ECW)

        Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

Kilolo Kijakazi, Acting Commissioner of
Social Security,

        Defendant.

This matter is before the Court on Plaintiff Mario O.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 23) and Defendant's Motion for Summary Judgment (Dkt. 29). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying his application for disability insurance benefits. This case has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.    BACKGROUND

On June 6, 2019, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability as of January 1, 2017 due to prostate cancer.[1]  (R. 11, 166, 198.)  His application was denied initially and on reconsideration.  Plaintiff filed a written request for a hearing, and on September 28,

---

[1]    The Social Security Administrative Record ("R.") is available at Docket Entry 22.

2020, Plaintiff appeared and testified at a hearing before Administrative Law Judge Hortensia Haaversen ("the ALJ").  (R. 11, 44.)

The ALJ issued an unfavorable decision on April 8, 2019, finding that Plaintiff was not disabled.  (R. 12-18.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of January 1, 2017.  (R. 13.)

At step two, the ALJ determined that Plaintiff had the following medically determinable impairments: prostate cancer; gastrointestinal reflux disease (GERD); adjustment disorder with depressed and anxious mood; alcohol use in remission; and cannabis use.  (R. 13.)  The ALJ also concluded that Plaintiff's impairments or combination thereof had not significantly limited (or was expected to significantly limit)

---

[2]     The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

the ability to perform basic work-related activities for 12 consecutive months.  (R. 13, 19.)

Given that the ALJ found that Plaintiff does not have a severe impairment or combination of impairments, she found Plaintiff not disabled.  (R. 11, 18.)

Plaintiff requested review of the decision.  (R. 1.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-5.)  Plaintiff then commenced this action for judicial review.  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of the record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.   RELEVANT RECORD

On or about September 18, 2017, Plaintiff was diagnosed with prostate cancer. (R. 363.)

From September 2017 through May 2020 Plaintiff consistently demonstrated normal behavior, mood, and affect upon examination.  (*See*, *e.g.*, R. 287, 291, 294, 304, 309, 313, 320, 323, 335, 344, 350, 357, 371, 383, 387, 390, 396, 399, 402, 405, 540, 550, 557, 585, 624, 656, 716, 854-55, 868, 908.)

On January 30, 2018, Plaintiff denied any bladder incontinence.  (R. 334.)

On April 8, 2019, Plaintiff reported to his providers some intermittent urinary incontinence, but only if he did not double void.  (R. 290-91.)

On April 17, 2019, Plaintiff was seen for a follow-up for his prostate cancer.  (R. 286.)  While he noted some post-void dribbling, he denied any incontinence.  (R. 286.)

On May 28, 2019, Plaintiff was seen for lower back pain, but noted no symptoms or pain in his legs.  (R. 261.)  It was opined by the physical therapist that "patient has met all goals, and is no longer functionally limited by his low back/legs."  (R. 261.)

During a July 5, 2019 examination, Plaintiff showed a smooth and coordinated gait, and he showed a normal mood and affect.  (R. 265.)

On July 23, 2019, Plaintiff was seen for sciatica as part of physical therapy related to his back.  (R. 558.)  He noted no pain or symptoms in his legs.  (R. 558.)

On August 5, 2019, Plaintiff represented in his function report that he spent time with others, went fishing with others 1-2 times per week; went shopping every two days; and went to church on a regular basis.  (R. 215-19.)  He also asserted that he had no limitations with completing tasks, concentrating, understanding, following instructions, or getting along with others; and claimed he got along "good" with authority figures, such as bosses.  (R. 220-22.)

On August 13, 2019, Plaintiff noted during a urology appointment that his urinary symptoms were under decent control with occasional urinary urgency and post-void dribble that were of little burden to him but was irritating on days when it occurred more frequently.  (R. 551.)  He noted no other urological concerns.  (R. 551-52.)

On September 20, 2019, Plaintiff was seen by Dr. Alford Karayusuf for a consultative mental examination for the Commissioner.  (R. 524-27.)  Plaintiff's chief complaint was his prostate cancer, which he noted was diagnosed three years prior, but

because his PSA numbers were not high the condition was just watched and observed. (R. 524.) More recently, doctors had taken "something like 20 biopsies of his prostate to determine" the seriousness of the cancer and whether further treatment was necessary. (R. 524.) He reported that he lived alone in a house, that he had four daughters and two stepsons that he visited 3-4 times per week, and with whom he had very good relationships. (R. 525.) Plaintiff also reported cooking for himself, playing cards on occasion, and "visit[ing] with friends every day." (R. 525.) Dr. Karayusuf found Plaintiff related in a subdued, anxious looking manner; he was not restless; he showed no psychomotor agitation or psychomotor retardation or no vigilance; his tension level was moderate, eye contact was good, and speech was normal; he showed no pressure or flight of ideas; his facies were subdued; his mood was moderately depressed; his affect was appropriate; he had no loosening of associations; and his recent and remote memory were intact. (R. 525.) Dr. Karayusuf's diagnosis for Plaintiff was alcohol dependance in remission, cannabis usage, episodic, and adjustment disorder with anxious and depressed mood. (R. 525.) Plaintiff's prognosis was guarded. (R. 525.) Dr. Karayusuf's conclusions for Plaintiff included the following:

> He is able to understand, retain and follow instructions. He is restricted to superficial interactions with fellow workers, supervisors and the public. Within these parameters and in the context of performing simple, repetitive tasks, he is able to maintain pace and persistence.

(R. 525.)

On October 9, 2019, Plaintiff was diagnosed with intermediate risk prostate cancer. (R. 534.) Plaintiff denied any "bothersome" urinary tract symptoms. (R. 534.)

Plaintiff showed no emotional distress during this appointment, and his mood/effect were normal. (R. 535-36.)

On November 13, 2019, Plaintiff underwent a prostatectomy. (R. 655, 664.) As part of his assessment, it was noted that Plaintiff had no diagnosed mental disorder and no such disorder had significantly impaired his functioning in major life activities within the past 3 to 6 months. (R. 672.) During his November 18, 2019, follow-up, it was noted that he was using a catheter bag for his urine. (R. 655.)

On November 27, 2019, Plaintiff was evaluated for physical therapy as a result of his incontinence post-prostatectomy. (R. 723-24.) Plaintiff claimed constant loss of bladder control over the previous 24 hours. (R. 724.) Plaintiff was referred to physical therapy services for urinary stress incontinence. (R. 727.)

On December 3, 2019 and January 15, 2020, Plaintiff was seen for an evaluation of a left Baker's Cyst. (R. 708, 712.) As of January, the mass on the posterior medial left knee had been persistent for three months. (R. 713, 754.) It was noted that Plaintiff was doing well. (R. 708, 712.) Plaintiff sought aspiration of his cyst. (R. 708.) He was told to rest, ice, heat, elevate, and use over the counter medications as needed. (R. 708, 712.) The ultrasound-guided aspiration occurred on January 29, 2020. (R. 710-11, 735-36.) During his December 3 appointment, it was noted that Plaintiff ambulated with a smooth and coordinated gait. (R. 722.) During the January 15 appointment, Plaintiff noted pain with flexion, which he described as a pinching sensation, but he was able to sit comfortably and had a normal gait upon examination. (R. 754-55.)

On December 4, 2019, state agency psychologist Ray Conroe, Ph.D., L.P., conducted a psychiatric review technique during which he determined under the "A" criteria of the Listings that a medical determinable impairment was present that did not precisely satisfy 12.06 (Anxiety and Obsessive Compulsive Disorder) of the Listing.  (R. 73.)  Under the "B" criteria of the Listing, Dr. Conroe opined that there were no limitations with respect to understanding, remembering, or applying information, or interacting with others.  (R. 73.)  He also opined that Plaintiff had mild limitations as to his ability to concentrate, persist, maintain, and manage himself.  (R. 73.)  Dr. Conroe noted that the opinion from Dr. Karayusuf was partially consistent with the objective evidence in the medical record.  (R. 73.)  Dr. Conroe went on to find as follows:

> The MSO from the CE is partially consistent with objective medical evidence on file. MSO restricts claimant to superficial interaction and simple and repetitive tasks and ability to understand, retain, and follow directions. The limitation r/e social interaction and simple and repetitive tasks is not consistent with objective medical evidence. The ability to understand, retain, and follow directions is consistent with objective medical evidence on file. At CE claimant reports never being psychiatrically hospitalized or involved with outpatient psychiatric care nor prescribed psychotropic meds. Claimant's chief c/o is in regards to prostate cancer. Claimant also reports he stopped drinking alcohol about 6 months ago. Claimant reports going to church and is able to concentrate on church services. Watches tv and able to remember what he is watching. Able to remember what he reads. Visits with friends everyday. MSE showed claimant cooperative and answered questions, had good eye contact, was not tearful. Therefore, the MSO is partially consistent with objective medical evidence.
>
> Claimant's mental health condition would not impose more than a minimal affect on functioning.
> Non-severe.

(R. 73.)  This opinion remained the same as part of the April 20, 2020 reconsideration by Mera Kachgal, Ph.D., L.P.  (R. 86-87.)

On December 20, 2019, Plaintiff noted during his physical therapy for his incontinence that he has no control over his daytime incontinence. (R. 719.)

On January 3, 2020, Plaintiff reported not urinating in the toilet during the day because he lost his urine from incontinence most of the time. (R. 717.) Plaintiff asserted that he urinated in the toilet two times a day over the previous week. (R. 717.) Plaintiff had no problems with incontinence sitting or lying down during the day, but experienced incontinence during most of the day while walking. (R. 718.)

On January 17, 2020, Plaintiff attended a physical therapy session related to his urinary incontinence. (R. 711.) Plaintiff noted with respect to his daytime urinary incontinence that he had "no problem with sitting or laying [sic] down; 2 times per day going to the toilet after holding his urine, incontinence with walking 35% better." (R. 711.) It was noted that Plaintiff was wearing a protective undergarment that was wet. (R. 711.)

During his January 31, 2020 physical therapy appointment, Plaintiff represented with respect to his daytime urinary incontinence that he had "no problem with sitting or laying [sic] down; urinary urge reported approximately 2 times per day with successful voiding in the toilet without leaking, timed voiding every hour with urine production <50% of the time, incontinence with walking 35% better." (R. 749.)

On February 25, 2020, Plaintiff was seen for worsening left knee pain with swelling since the aspiration of his Baker's cyst on January 15, 2020. (R. 853.) Plaintiff had full range of motion of his knee but had tenderness to palpitation over the medial knee. (R. 853-54.) Tylenol was of no benefit for his pain. (R. 853.) He also noted pain

with walking.  (R. 853.)  The most likely etiology of the pain was the return of the cyst.

(R. 853.)  He was able to climb onto the exam table without difficulty.  (R. 854.)

On February 27, 2020, Plaintiff underwent physical therapy.  (R. 860.)  Plaintiff

complained of left knee pain that was worse when walking.  (R. 860.)  With respect to his

daytime incontinence, Plaintiff reported that he had "no problem with sitting or laying

[sic] down" and "Urinates based on urge about 5-6x/day" while his "incontinence with

walking [was] 60% better."  (R. 860.)  On the same day he reported to his treating

provider as follows:

> Much more urinary control at this point. He has been going to physical
> therapy appointments and feels that they are helping him a lot. His urinary
> incontinence has been improving dramatically over the past month or so. He
> does still use 3 depends per day but they are not very wet when he changes
> them.

(R. 867.)  His examination showed excellent strength throughout.  (R. 868.)

On March 5, 2020, Plaintiff presented for an evaluation of his left knee Baker's

cyst.  (R. 876.)  Plaintiff rated his pain as 8 out of 10.  (R. 876.)  The pain was

exacerbated with movement and increased as the day went on.  (R. 876.)  Plaintiff

claimed that ambulation remained difficult due to pain.  (R. 876.)  Plaintiff showed 0

degree of extension and 120 degrees of flexion with normal strength.  (R. 876.)  Imaging

showed minimal tricompartmental degenerative changes.  (R. 876.)  Plaintiff underwent a

cortisone shot and was instructed to rest and elevate the knee as necessary.  (R. 877.)

On March 12, 2020, Plaintiff reported improvement with his daytime incontinence

by 60-65 percent while walking.  (R. 888.)  Plaintiff had no issues with incontinence

when sitting or lying down.  (R. 888.)

As part of the April 20, 2020 agency reconsideration of Plaintiff's claim, state agency medical doctor George Erhard noted the following:

> Updated MER includes a new allegation of a L sided baker's cyst which is NS and can be managed by aspiration or in some cases surgical intervention. This will not be the source of a persistent durational physical limitation.
>
> An additional allegation is urinary incontinence post Robotic Prostatectomy. The magnitude of the problem related in 3441 is partially inconsistent with clmt's most recent MER This is a common transient problem post Robotic Surgery which spares the nerves relate[d] to bladder control. It is highly unlikely this will be a durational issue.

(R. 84.)

On April 27, 2020, Plaintiff reported that his left knee had been successfully treated with an injection, but that he had been having similar pain with his right knee. (R. 894.) He was able to bend his knee and walk, but was experiencing pain. (R. 894.) The imaging of the right knee showed mild arthritis with small joint effusion. (R. 894.) Plaintiff was prescribed with meloxicam for his pain. (R. 894.)

At a May 28, 2020 urology follow-up, Plaintiff reported that he was feeling well, and that the pain from his surgery was gone. (R. 908.) He also represented that he had "[m]uch more urinary control at this point. His urinary incontinence has still been improving over the past month or so. He does still use 2 depends per day but they are not very wet when he changes them." (R. 908.) It was noted that that incontinence is quite normal after prostatectomy and normally slowly improves over months, and even up to 1 year, and that Plaintiff appeared to be improving, and they would discuss other measures to the extent that he did not progress further. (R. 910.)

On June 19, 2020, Plaintiff reported a rash secondary to his incontinence and that pain to his left knee had returned. (R. 916.)

On July 29, 2022, it was noted that he was taking high doses of Tylenol and meloxicam for his knee pain with significant improvement. (R. 922.) Plaintiff declined any further orthopedic treatment. (R. 923.)

During the September 28, 2020 hearing before the ALJ, Plaintiff testified that he could not work since January 2017 due to pain in his prostate, as every time he has to move fast he feels pain and gets wet. (R. 56-58.) He also noted that if he lifts more than 10-12 pounds, he also gets wet. (R. 58.)

## III.   LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means— and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (cleaned up). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (cleaned up). "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.    DISCUSSION

Plaintiff raises two issues on appeal from the Commissioner's decision. First, Plaintiff argues that the ALJ erred at step two of the sequential evaluation, by failing to properly consider Plaintiff's knee condition and his urinary incontinence and classifying them as non-medically determinable impairments. (Dkt. 24 at 7.)

Second, Plaintiff argues that the ALJ failed to properly evaluate the opinions provided by the psychological consultative examiner, Dr. Karayusuf, who diagnosed Plaintiff with adjustment disorder with anxious and depressed mood, and found that Plaintiff's mental health condition was severe in nature in that it impacted Plaintiff's ability to perform basic work activities. (*Id.* at 12.) The Court addresses these arguments in turn below.

## A.   Physical Impairments at Step Two of the Analysis

Plaintiff argues that the ALJ erred at step two of the evaluation by finding that he did not suffer from a severe medically determinable impairment.  (Dkt. 24 at 7.)  Plaintiff acknowledges that the ALJ did find that he did suffer from a number of non-severe medically determinable impairments, including prostate cancer, GERD, an adjustment disorder with depressed and anxious mood, alcohol use in remission, and cannabis use. (*Id.*)  However, Plaintiff asserts that the ALJ did not consider that the record supported other impairments, including his conditions related to his left knee and his incontinence, for which he received substantial treatment.  (*Id.* at 7-8.)  Plaintiff goes onto argue that it was legally incorrect for the ALJ to classify these impairments as non-medically determinable impairments; that had the ALJ correctly classified the impairments, the ALJ would have had to then determine whether either impairment was a severe or non-severe impairment; and that if either impairment was severe, the ALJ would have had to proceed to the next step in the sequential evaluation process.  (*Id.* at 7-11.)  The Commissioner counters that Plaintiff's short-term incontinence resolved within seven months, well within the second step's 12-month duration requirement; that to the extent that Plaintiff wore protective undergarments, the medical records show they were effective and allowed him to go about his normal activities; and that Plaintiff did not produce evidence that linked incontinence (with protective undergarments) to a restriction of work-related activities.  (Dkt. 30 at 9.)  On reply, Plaintiff argued that the first question is whether these impairments are even medically determinable impairments, and if they are then it is the ALJ's duty to consider those impairments and determine whether they are severe or

not severe, and not the Commissioner's job to make such a determination after the fact.
(Dkt. 31 at 3.)

At the second step, the SSA considers "the medical severity of [a claimant's]
impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). Plaintiff is not disabled if he does not
"have a severe medically determinable physical or mental impairment that meets the
duration requirement in § 404.1509, or a combination of impairments that is severe and
meets the duration requirement[.]" *Id.* "To be 'severe,' an impairment must first be
'medically determinable.' *Matthews v. Kijakazi*, No. 4:21CV307/MW/ZCB, 2022 WL
4355348, at *3 (N.D. Fla. Aug. 30, 2022), *R. & R. adopted*, 2022 WL 4358099 (N.D. Fla.
Sept. 20, 2022). Under the Commissioner's, regulations medically determinable
impairments:

> [M]ust result from anatomical, physiological, or psychological abnormalities
> that can be shown by medically acceptable clinical and laboratory diagnostic
> techniques. Therefore, a physical or mental impairment must be established
> by objective medical evidence from an acceptable medical source. We will
> not use your statement of symptoms, a diagnosis, or a medical opinion to
> establish the existence of an impairment(s). **After we establish that you
> have a medically determinable impairment(s), then we determine
> whether your impairment(s) is severe**.

20 C.F.R. § 404.1521 (emphasis added); *see also* Social Security Ruling ("SSR") 16-3p,
2016 WL 1119029, at *3 (Mar. 16, 2016) (The SSA "must have objective medical
evidence from an acceptable source to establish the existence of a medically determinable
impairment that could reasonably be expected to produce an individual's alleged
symptoms.").

It is a claimant's burden of demonstrating that objective medical evidence shows medically determinable impairment or combination of impairments at step two of the sequential evaluation.  *See Rickey P. V. v. Kijakazi*, No. 20-CV-2199 (JFD), 2022 WL 3214991, at *6 (D. Minn. Aug. 9, 2022); *see also Medley v. Saul*, No. 1:18 CV 211 CDP, 2019 WL 4169190, at *3-4 (E.D. Mo. Sept. 3, 2019); 20 C.F.R. § 404.1521.  "

### 1.    Plaintiff's Knees

With respect to Plaintiff's knees, the ALJ found as follows at step two:

> Regarding the claimant's allegations of knee pain, raised at the hearing, there is minimal evidence of any issues found in the record. There is some reference from the claimant as to knee pain, which he raised at a medical visit to HCMC in February 2020.  However, the claimant ambulated with a normal gait and station, and demonstrated full range of motion in the knees.
>
> His only objective symptom was some tenderness to palpation in the medial left knee (Exhibit 10F/4).

(R. 15.)

Even assuming that this constituted the ALJ's determination that the knee pain did not constitute a medically determinable impairment, the Court concludes that this finding by the ALJ is not supported by substantial evidence in the record as a whole.

On December 3, 2019, and January 14, 2020, Plaintiff was seen for an evaluation of a left knee Baker's Cyst.  (R. 708, 712.)  The provider noted a palpable fluid mass in popliteal fossa consistent with a Baker's cyst.  (R. 755.)  As of January, the mass on the posterior medial left knee had been persistent for three months.  (R. 713, 754.)  Plaintiff sought aspiration of his cyst.  (R. 708.)  The ultrasound-guided aspiration occurred on January 29, 2020.  (R. 710-11, 735-36.)  During a January 15, 2020 appointment,

Plaintiff noted pain with flexion, which he described as a pinching sensation, but he was able to sit comfortably and had a normal gait upon examination. (R. 754-55.) On February 25, 2020, Plaintiff was seen for worsening left knee pain with swelling since the aspiration of his Baker's cyst in January. (R. 853.) Plaintiff had full range of motion of his knee but had tenderness to palpitation over the medial knee. (R. 853-54.) Tylenol was of no benefit for his pain. (R. 853.) He also noted pain with walking. (R. 853.) On February 27, 2020, Plaintiff complained of left knee pain that was worse when walking. (R. 860.)

On March 5, 2020, Plaintiff presented for an evaluation of his left knee Baker's cyst. (R. 876.) Plaintiff rated his pain as 8 out of 10. (R. 876.) The pain was exacerbated with movement and increased as the day went on. (R. 876.) Plaintiff claimed that ambulation remained difficult due to pain. (R. 876.) Plaintiff showed 0 degree of extension and 120 degrees of flexion with normal strength. (R. 876.) Imaging showed minimal tricompartmental degenerative changes. (R. 876.) Plaintiff underwent a cortisone shot and was instructed to rest and elevate the knee as necessary. (R. 877.)

On April 27, 2020, Plaintiff reported that his left knee had been successfully treated with an injection, but that he had been having similar pain with his right knee. (R. 894.) He was able to bend his knee and walk, but was experiencing pain. (R. 894.) The imaging of the right knee showed mild arthritis with small joint effusion. (R. 894.) Plaintiff was prescribed with meloxicam for his pain. (R. 894.)

On June 19, 2020, Plaintiff reported that pain to his knee had returned. (R. 916.)

Given the diagnosis of a Baker's cyst on Plaintiff's left knee, the cyst's aspiration by medical providers, the diagnostic imaging showing degenerative changes of both knees, and the cortisone shot and medication treatment, the Court cannot comprehend based on the available objective medical evidence why the ALJ did not find that Plaintiff had a medically determinable impairment(s) with respect to his knees. The Court cautions that it is not making a determination on the ultimate severity of Plaintiff's knee condition(s) or whether he is ultimately eligible for benefits. However, given the failure by the ALJ to address the objective medical evidence in the record, the Court recommends remand to the ALJ to address the issue of severity as to Plaintiff's knees for the purposes of step two of the sequential analysis and, to the extent necessary, a continuation of the analysis through step five.

### 2.    Plaintiff's Incontinence

The only mention in the ALJ's opinion of incontinence is that Plaintiff had asserted that he experienced incontinence while lifting greater than 10 to 12 pounds. (R. 14.) The objective medical evidence in the record unquestionably supports that Plaintiff has suffered from incontinence during the relevant period. (*See*, *e.g.*, R. 711, 717-18, 723-24, 727, 749, 867, 908-10.) Indeed, Plaintiff's provider noted that incontinence was normal post-prostatectomy and normally slowly improves over months, or even up to 1 year. (R. 910.) The Commissioner does not assert in his brief that Plaintiff did not experience incontinence or that incontinence does not constitute a medically determinable impairment and the ALJ did not set forth why she determined that the condition did not qualify as a medically determinable impairment for the purposes of step two. "If an ALJ

concludes that an impairment is not medically determinable, then the ALJ must explain that conclusion. Absent such an explanation, a court 'is unable to exercise meaningful judicial review.'" *Matthews*, 2022 WL 4355348, at *3 (quoting *Carter v. Kijakazi*, No. 5:20-cv-100, 2022 WL 509359, at *5 (S.D. Ga. Feb. 1, 2022)). Because the ALJ did not explain her decision, remand is appropriate to address Plaintiff's incontinence for the purposes of step two of the sequential analysis and, to the extent necessary, a continuation of the analysis through step five.

## B.    Opinion of Dr. Karayusuf

The ALJ determined that Plaintiff suffered from the medically determinable mental impairment of adjustment disorder with depressed and anxious mood. (R. 13.) In determining the severity of a claimant's mental impairments at step two of the sequential evaluation, the ALJ must use the "special technique" described in 20 C.F.R. § 404.1520a. *See Cuthrell v. Astrue*, 702 F.3d 1114, 1117 (8th Cir. 2013). The ALJ first "evaluate[s] [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). The ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: the ability to (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, maintain pace; and (4) adapt or manage oneself. *See id.* § 404.1520a(c)(3). The criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. *See id.* § 404.1520a(c)(4). Pursuant to the Commissioner's regulations, "[i]f we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s)

is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1). "[T]o be considered a severe impairment at step two, a mental impairment need not cause marked restrictions."  *Timi W. v. Berryhill*, No. 117CV01366SLDEIL, 2019 WL 1227840, at *2 (C.D. Ill. Mar. 15, 2019) (citing 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' [as opposed to moderate, marked, or extreme,] we will generally conclude that your impairment(s) is not severe . . . .")). Indeed, courts have concluded that a "moderate" limitation is sufficient to support a finding of "severity" at the second step of the process.  *See Vicky R. v. Saul*, No. 19-CV-2530 (ADM/ECW), 2021 WL 536297, at *8 (D. Minn. Jan. 28, 2021) (collecting cases), *R.&R. adopted*, 2021 WL 533685 (D. Minn. Feb. 12, 2021).

With respect to step two, the ALJ found that Plaintiff's "medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere."  (R. 18 (emphasis in original).)  With respect to Plaintiff's mental impairments, and Dr. Karayusuf's opinions thereof, the ALJ found as follows:

> The claimant's mental status examinations throughout the period at issue have been within normal limits. For example, the claimant has consistently demonstrated a normal mood, with intact thought content, and no evidence of any concentration deficits (Exhibit 10F/4-5). Nonetheless, the claimant presented for a psychiatric evaluation with Alford Karayusuf, M.D., on September 20, 2019. The claimant did not indicate any history of psychiatric issues, but did affirm that once he received his cancer diagnosis, he became depressed. The claimant professed to have memory and concentration deficits from the depression. As for his functioning, the claimant

acknowledged being able to manage his personal care and perform household chores routinely, in addition to attending church services weekly, which he was able to concentrate on. Under examination, the claimant's memory remained intact, and he demonstrated appropriate concentration, though his mood was determined to be moderately depressed. Dr. Karayusuf assessed the claimant with adjustment disorder with anxious and depressed mood (Exhibit 2F). As noted, there is nothing further in the record to support any mental health issues, and the claimant has not engaged in any sustained treatment for depression or anxiety, even with respect to his medication regimen (Exhibits 14E, 8F/10).

* * *

The claimant's mental condition additionally remains stable. Though the claimant attested to depression, his mental status examinations have shown normal memory and concentration, with intact functioning (Exhibit 2F). The claimant has continued to occasionally use marijuana though there is nothing within the evidence to suggest that this has affected his other impairments in any way. The claimant previously experienced alcohol abuse, though there is no suggestion the alcohol usage significantly restricted his functioning or exacerbated his other impairments, and the claimant himself has remained abstinent from alcohol use since at least late 2018 (Exhibits 1F/20 & 6F/8). Accordingly, there is nothing to support a severe mental impairment.

The conclusion that the claimant does not have an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities is consistent with the objective medical evidence and other evidence. This is supported by the opinion evidence available in the medical record. On November 28, 2019, Jeffrey Gorman, M.D., a State medical consultant, opined that the claimant had no severe physical impairments (Exhibit 1A/9). On April 20, 2020, a separate State medical consultant, George Erhard, M.D., affirmed this finding (Exhibit 3A). Likewise, two State psychiatric consultants, Ray Conroe, Ph.D. (Exhibit 1A/10) and Mera Kachgal, Ph.D. (Exhibit 3A/9), opined that the medical findings supported no greater than mild limits in sustaining concentration and in adapting to or managing oneself, with the psychiatric impairments non-severe.

An administrative law judge is not bound by the findings of State agency physicians or consultants (20 CFR 416.927(e)). Nonetheless, in the present case, the medical findings support the conclusions of the State consultants, as the record does not corroborate the impairments impose more than a minimal restriction to his functioning. The undersigned therefore finds the opinions persuasive.

> The undersigned does not find the opinion of Dr. Karayusuf persuasive. He opined the claimant could understand, retain, and follow instructions, but was restricted to simple, repetitive tasks and superficial interactions with fellow workers, supervisors and the public (Exhibit 2F/2). This statement is inconsistent with the medical findings as a whole, as well as the findings of his own examination of the claimant, in addition to the claimant's own subjective statements at the examination, wherein he affirmed social activities with friends every day. As such, the undersigned does not find this opinion to be persuasive.

(R. 16-17.)

Plaintiff argues that the ALJ failed to properly evaluate Dr. Karayusuf's opinion with respect to consistency and supportability, as required by the Commissioner's regulations under 20 C.F.R. § 404.1520c. (Dkt. 24 at 12-15; Dkt. 31 at 6.) In this regard, Plaintiff complains that:

> The ALJ cursorily declared that the opinions were inconsistent with the record as well as Dr. Karayusuf's own opinions.
>
> The ALJ did not properly consider the supportability factor. The supportability factor reviews the relevant medical evidence and supporting explanations presented by the medical source used in support of their own opinion. 20 C.F.R. § 404.1520c(c)(1). When discussing the supportability factor, the ALJ only claimed that Dr. Karayusuf's opinions were inconsistent with Mr. [O.'s] own statements regarding his interaction with friends on a daily basis. Tr. 17. This was the only analysis offered by the ALJ regarding the supportability factor. There was not [sic] other discussion at all regarding the supportability factor.

(Dkt. 24 at 13.) Because the ALJ violated the regulation, Plaintiff asks that the Court reverse the ALJ's decision and remand this case for further proceedings. (*Id.* at 15; Dkt. 31 at 6.) Plaintiff also takes issue with the conclusory remarks regarding consistency and, with respect to supportability, argues that the ALJ failed to explain how the ability to spend time with friends dismissed any interactional limitations in the workplace. (Dkt.

31 at 5-6.)  Defendant argued that the ALJ used the criteria under § 404.1520c when

finding Dr. Karayusuf's opinion not entirely persuasive.  (Dkt. 30 at 13-14.)  In addition,

Defendant argues that the lack of treatment and ability to engage in social activities,

including visiting with friends every day and seeing his children at least three times a

week supports the reliance placed by the ALJ on Dr. Karayusuf's opinion.  (*Id.*)

Because Plaintiff's claim was filed after March 27, 2017, the applicable regulation

is 20 C.F.R. § 404.1520c.  *See David A. P. v. Kijakazi*, No. 20-CV-1586 (TNL), 2022

WL 980302, at *14 (D. Minn. Mar. 31, 2022).  Pursuant to § 404.1520c:

> [An ALJ] will not defer or give any specific evidentiary weight, including
> controlling weight, to any medical opinion(s) or prior administrative medical
> finding(s), including those from your medical sources. When a medical
> source provides one or more medical opinions or prior administrative
> medical findings, [an ALJ] will consider those medical opinions or prior
> administrative medical findings from that medical source together using the
> factors listed in paragraphs (c)(1) through (c)(5) of this section, as
> appropriate. The most important factors we consider when we evaluate the
> persuasiveness of medical opinions and prior administrative medical findings
> are supportability (paragraph (c)(1) of this section) and consistency
> (paragraph (c)(2) of this section).

20 C.F.R. § 404.1520c(a).  Those factors include the supportability and consistency of

medical opinions and may consider the relationship with the claimant, specialization, and

other factors.  20 C.F.R. § 404.1520c(c).  According to the SSA's regulations:

> The factors of supportability (paragraph (c)(1) of this section) and
> consistency (paragraph (c)(2) of this section) are the most important factors
> we consider when we determine how persuasive we find a medical source's
> medical opinions or prior administrative medical findings to be. Therefore,
> we will explain how we considered the supportability and consistency factors
> for a medical source's medical opinions or prior administrative medical
> findings in your determination or decision. We may, but are not required to,
> explain how we considered the factors in paragraphs (c)(3) through (c)(5) of

this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2); *see also Michael B. v. Kijakazi*, No. 21-CV-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022) ("The "most important factors" are supportability and consistency.") (citing 20 C.F.R. § § 404.1520c(b)(2)).

The SSA has described supportability and consistency as follows:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2).

An ALJ is not required to explain the remaining factors unless the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well supported . . . and consistent with the record . . . but are not exactly the same." 20 C.F.R. § 404.1520c(b)(2)-(3)).

The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017). No talismanic language is required for the ALJ to meet the requirements of § 404.1520c, only that the ALJ make it clear that they considered the supportability and consistency of

an opinion. *See Diane M. W. v. Kijakazi,* No. 20-CV-2651 (SRN/ECW), 2022 WL

4377731, at *5 (D. Minn. Sept. 22, 2022) (citations omitted).

While Plaintiff asserts that the ALJ only considered Plaintiff's statements

regarding his interaction with friends on a daily basis and not the medical evidence in the

record with respect to supportability of Dr. Karayusuf's opinions, Plaintiff ignores that

the ALJ addressed the fact that his mental status examinations throughout the period at

issue had been within normal limits. (R. 16.) Indeed, as set forth above, Plaintiff's

psychiatrist examinations have been normal throughout the relevant period. (*See*, *e.g.*, R.

287, 291, 294, 304, 309, 313, 320, 323, 335, 344, 350, 357, 371, 382, 387, 389, 396, 399,

402, 405, 540, 550, 556, 585, 624, 656, 716, 854-55, 868, 908.) Even Dr. Karayusuf

noted in his own opinion that Plaintiff "has never been psychiatrically hospitalized nor

involved in outpatient psychiatric care nor ever prescribed psychotropic medications."

(R. 524.) The ALJ also considered the state agency psychologists, who all opined that

the medical findings supported no greater than mild limitations in sustaining

concentration and in adapting to or managing oneself; no limitation as to his ability to

understand, remember or apply information; and no limitation as to his ability to interact

with others and ultimately found the psychiatric impairments non-severe. (R. 17, 73, 86-

87.)

Similarly, with respect to the consistency of Dr. Karayusuf's opinion, the ALJ

relied on the medical findings in the record, which, as set forth above, noted no

psychiatric problems throughout the relevant period (even around the time of Dr.

Karayusuf's opinion) and the opinions of the state agency psychologists. The ALJ also

pointed to Dr. Karayusuf's findings during his examination of Plaintiff: "Under examination, the claimant's memory remained intact, and he demonstrated appropriate concentration, though his mood was determined to be moderately depressed." (R. 16, 17; *see also* R. 525.) Moreover, the ALJ relied on Plaintiff's own statement at the examination that he went out every day with friends (R. 17) as a counter to Dr. Karayusuf's claim that he could only have superficial interaction with others, for which there is no prohibition under § 404.1520c(c)(2), which allows the ALJ to consider nonmedical sources. Indeed, Plaintiff represented to Dr. Karayusuf that he went out with his friends on a daily basis, which is inconsistent with Dr. Karayusuf's opinion that Plaintiff is limited to superficial contacts with others.[3] (R. 525.)

It is important to emphasize that Plaintiff makes it clear that he is not challenging the finding that there was no severe mental impairment, only the process used by the ALJ under the regulations. (R. 31 at 6.) For the reasons set forth above, the Court finds no error with respect to the ALJ's consideration of Dr. Karayusuf's opinions under the

---

[3] As stated previously, Plaintiff argues that the ALJ's reliance on Plaintiff's going out with friends on a daily basis assumes that interactions with friends is the same as interaction with supervisors, coworkers, and the public, which is not the case. (Dkt. 24 at 14; Dkt. 31 at 5.) Plaintiff provides no authority for this proposition. Moreover, this argument does not address whether the ALJ complied with the requirements of § 404.1520c in notifying the reader of her basis for finding Dr. Karayusuf's opinions not persuasive, but rather deals with whether the ALJ's decision regarding Plaintiff's ability to interact with others is supported by substantial evidence.

regulations with respect to setting forth the basis for not finding the opinions persuasive, and therefore, remand on this issue should be denied.[4]

## V.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Plaintiff's Motion for Summary Judgment (Dkt. 23) be **GRANTED** in part and **DENIED** in part;

2.    Defendant Commissioner Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 29) be **GRANTED** in part and **DENIED** in part;

3.    This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation; and

4.    This case be **DISMISSED WITH PREJUDICE**.

DATED: December 13, 2022                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

---

[4]    For the reasons stated above, the Court also rejects Plaintiff's contention that "[t]he ALJ was merely looking for some reason to discredit an opinion that did not fit into the ALJ's predetermined narrative." (Dkt. 24 at 15.) "ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quoting *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)). "A claimant bears the burden of producing sufficient evidence to overcome this presumption." *Id.* Outside of this hyperbole, Plaintiff provides no basis to overcome this presumption.

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).